# POINTER *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF ARKANSAS.

No. 759.  Submitted October 19, 1893. — Decided January 22, 1894.

The provision in Rev. Stat. § 1024, that "when there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offences, which may be properly joined, instead of having several indictments, the whole may be joined in one indictment, in separate counts; and if two or more indictments are joined in such cases, the court may order them to be consolidated," leaves the court to determine whether, in a given case, a joinder of two or more offences in one indictment is consistent with settled principles of criminal law, and also free to compel the prosecution to elect under which count it will proceed, when it appears from the indictment or from the evidence, that the prisoner may be embarrassed in his defence, if that course be not pursued.

When an indictment contains two counts charging the commission of two murders, committed on the same day, in the same county and district, and with the same kind of instrument, the court is justified in forbearing at the beginning of the trial, and before the disclosure of the facts, to compel an election by the prosecutor between the two charges.

When, in the case of such joinder, it is developed in the course of the trial that the accused was not confounded in his defence by the union of the two offences in the same indictment, and that his substantial rights will not be prejudiced by the refusal of the court to compel the prosecutor to elect upon which of the two he will proceed, the court is justified in such refusal.

All the panel of jurors were examined as to their qualifications, and thirty-seven were found not liable to objection for cause.  The defendant was

in court during this examination, was face to face with the jurors so examined, and had an opportunity to participate in the examination to such extent as was necessary for him to ascertain whether any of them were liable to objection for cause, and was at liberty to strike from the list of those thus found to be qualified the names of the persons, not exceeding twenty, whom he did not wish to serve on the jury. *Held,* that, the prisoner having been thus brought face to face with the jury during these proceedings, the proceedings were regular.

*Lewis* v. *United States,* 146 U. S. 376, adhered to and distinguished from this case.

The mode of designating and empanelling jurors for the trial of cases in the courts of the United States is within the control of those courts, subject only to the restrictions prescribed by Congress, and to such limitations as are recognized by settled principles of criminal law to be essential in securing impartial juries for the trial of offences.

A prisoner on trial in a Federal court under indictment for murder is not entitled as of right to have the government make its peremptory challenges before he makes his, although it is within the discretion of the court to direct it; and when the laws of the State in which the trial takes place prescribe such a course, the court may pursue that method or not as it pleases.

It is not indispensable to conviction for murder that the particular motive for taking the life of a human being shall be established by proof to the satisfaction of the jury.

When the record in a criminal case shows fully the crime for which the prisoner was indicted and all the proceedings thereon, through trial and verdict up to conviction and sentence, the failure in the sentence to name the crime for which the prisoner is sentenced may be supplied by reference to the rest of the record.

Whether a court of the United States, in the absence of authority conferred by statute, has the power, after passing sentence in a criminal case, to suspend its execution indefinitely, and until the court in its discretion removes such suspension; *Quære.*

THE case is stated in the opinion.

*Mr. S. B. Maxey* and *Mr. Jacob C. Hodges* for plaintiff in error.

*Mr. Assistant Attorney General Whitney* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

At the February term, 1892, of the Circuit Court of the United States for the Western District of Arkansas, the grand

jury returned an indictment against John Pointer for the crime of murder.

In the first count it was charged that the defendant, on the 25th of December, 1891, at the Choctaw Nation, in the Indian country, within the above district, did, with an axe, feloniously, wilfully, and of his malice aforethought, " strike, cut, penetrate, and wound " upon the head one Samuel E. Vandiveer, a white man and not an Indian, inflicting thereby a mortal wound, from which death instantly ensued. The second count charged the same offence, and differed from the first only in using the words " beat, bruise," in place of " cut, penetrate."

In the third count the defendant was charged,. in the words of the first count, with having, in the same manner, on the 25th of December, 1891, feloniously, wilfully, and of his malice aforethought, at the Chocktaw Nation, in the Indian country, within the same district, killed and murdered one William D. Bolding, a white man and not an Indian. The fourth count differed from the third only as the second count differed from the first.

The defendant pleaded not guilty. On a subsequent day of the term he moved to quash the indictment upon various grounds, one of which was that it charged two distinct felonies. That motion was overruled.

The defendant called the attention of the court to the fact that he had been served some time before with a list of thirty-seven jurors, and, subsequently, with an additional list. He objected to that mode of serving lists of jurors by " piece-meal." To this the court replied : " In the first place, the list of thirty-seven was served; and it always happens that some of the original thirty-seven cannot serve, by reason of incompetency or sickness, and, out of abundance of precaution, we had the additional list served on the defendant, so that there will be a sufficient number served to go on with the trial of the case, without waiting for two days' service on the defendant when the case is called for trial. It is not a service by piecemeal, but service of additional talesmen."

The entire panel of the petit jury was called and the jurors were examined as to their qualifications, and, the journal entry

states, thirty-seven in number were found to be generally qualified under the law, that is, in the words of the bill of exceptions, "qualified to sit on this case." The defendant and the government were then furnished, each, with a list of the thirty-seven jurors thus selected, that they might make their respective challenges, twenty by the defendant and five by the government, the remaining first twelve names, not challenged, to constitute the trial jury. The defendant at the time objected to this mode of selecting a jury: "1st, because it was not according to the rule prescribed by the laws of the State of Arkansas; 2d, because it was not the rule practised by common law courts; 3d, because the defendant could not know the particular jurors before whom he would be tried until after his challenges, as guaranteed by the statutes of the United States, had been exhausted; 4th, because the government did not tender to the defendant the jury before whom he was to be tried, but tendered seventeen men instead of twelve, and made it impossible for defendant to know who the twelve men before whom he was to be tried were until after his right to challenge was ended."

At the time this objection was made the defendant's counsel saved an exception to the mode pursued in forming the jury, and said: "The point we make is, that the government must offer us the twelve men they want to try the case." The court observed: "They offered you thirty-seven." "We understand," counsel said, "but we want to save that point."

Before the case was opened to the jury for the government, the defendant moved that the district attorney be required to elect on which count of the indictment he would claim a conviction. That motion having been overruled, he was required to go to trial upon all the counts.

Upon the conclusion of the evidence the defendant renewed the motion that the government be required to elect upon which count of the indictment it would prosecute him. This motion was overruled. After an elaborate charge, by the court, the jury retired to consider their verdict, and returned into the court the following: "We, the jury, find the defendant John Pointer guilty of murder as charged in the first

count of the indictment. F. M. Barrick, Foreman. We, the jury, find the defendant John Pointer guilty of murder as charged in the third count of the indictment. F. M. Barrick, Foreman."

A motion for a new trial was made and overruled, and on the 30th of April, 1892, the court sentenced the defendant to suffer the punishment of death.

1. The motion to quash the indictment and the motion to require the government to elect upon which count it would try the defendant, present the question whether two distinct charges of murder can properly be embraced in one indictment.

It is provided by section 1024 of the Revised Statutes — following, substantially, the words of the act of February 26, 1853, c. 80, 10 Stat. 161, that "when there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offences, which may be properly joined, instead of having several indictments, the whole may be joined in one indictment, in separate counts; and if two or more indictments are joined in such cases, the court may order them to be consolidated."

Although the two murders in question are alleged to have been committed by the defendant on the same day, and in the same county and district, it does not affirmatively appear from the indictment that they were the result of one transaction, or that they were "connected together." But the indictment does show upon its face that the two offences are of the same class or grade of crimes, and subject to the same punishment. Could both crimes properly be joined in one indictment, in separate counts? The statute does not solve this question, but leaves the court to determine whether, in a given case, a joinder of two or more offences in one indictment against the same person is consistent with the settled principles of criminal law. If those principles permit the joinder of two or more felonies in the same indictment, in separate counts, then the joinder in question here was proper.

In *People* v. *Gates,* 13 Wend. 311, 322, 323, Chief Justice Savage, speaking for the court, said : "The first question arising upon the trial was whether the court should have compelled the district attorney to elect which count he would go upon.   In *Young* v. *The King,* 3 T. R. 106, Buller, Justice, says that where different felonies are included in the same indictment, the judge may quash the indictment, lest it should confound the prisoner in his defence ; but these are only matters of prudence or discretion.   This court has recently said in the case of *People* v. *Rynders,* 12 Wend. 425, that there is no impropriety in trying a prisoner for different offences, at the same time, if the offences are charged in the same indictment and are of the same grade, and subject to the same punishment."   Substantially to the same general effect are the decisions of other American courts : *United States* v. *O'Callahan,* 6 McLean, 596 ; *Kane* v. *People,* 8 Wend. 203, 211 ; *Calloway* v. *Commonwealth,* 5 Met. 532, 534 ; *Commonwealth* v. *Gillespie,* 7 S. & R. 469, 476 ; *Commonwealth* v. *Hills,* 10 Cush. 530, 533 ; *Campbell* v. *State,* 9 Yerger, 333, 335 ; *Burk* v. *State,* 2 H. & J. 426, 429 ; *Storrs* v. *State,* 3 Missouri, 7 ; *Baker* v. *State,* 4 Pike, 56, 58 ; *Wright* v. *State,* 4 Humph. 194, 196 ; *Johnson* v. *State,* 29 Alabama, 62, 67 ; *Weinzorpflin* v. *State,* 7 Blackford, 186, 188 ; *State* v. *Hazard,* 2 R. I. 474, 482 ; *Hoskins* v. *State,* 11 Georgia, 92, 95.   See, also, *Logan* v. *United States,* 144 U. S. 263, 296.

The rule in England is not materially different.   In 1 Chitty's Criminal Law, 252, 253, it is said : "In cases of felony, no more than one distinct offence or criminal transaction at one time should regularly be charged upon the prisoner in one indictment, because, if that should be shown to the court before plea, they will quash the indictment lest it should confound the prisoner in his defence, or prejudice him in his challenge to the jury ; for he might object to a juryman's trying one of the charges, though he might have no reason so to do in the other ; and if they do not discover it until afterwards, they may compel the prosecutor to elect on which charge he will proceed."   "But," the author adds, "this is only matter of prudence and discretion which it rests with the judges to ex-

ercise." The rule is thus stated by Archbold (Crim. Pl. Pr. 95, c. 3, 8th ed.): "If different felonies or misdemeanors be stated in several counts of an indictment, no objection can be made to the indictment on that account in point of law. In cases of felony, indeed, the judge, in his discretion, may require the counsel for the prosecutor to select one of the felonies, and confine himself to that. This is what is technically termed putting the prosecutor to his election. But this practice has never been extended to misdemeanors." In Roscoe's Criminal Evidence, 8th Am. ed., 206, the author, after observing that there was no objection in point of law to inserting, in *separate* counts of the same indictment, several distinct felonies of the same degree and committed by the same offender, and that such joinder was not a ground for arrest of judgment, says: "In practice, where a prisoner was charged with several felonies in one indictment, and the party had pleaded, or the jury were charged, the court in its discretion would quash the indictment, or if not found out till after the jury were charged, would compel the prosecutor to elect on which charge he would proceed."

The question of election between distinct charges has always seemed to depend on the special circumstances of the case in which it has arisen. For instance, in *Regina* v. *Trueman*, 8 Car. & P. 727, which was an indictment for arson, containing five separate counts, each charging the firing of a house of a different owner, it appeared from the opening by the prosecutor that the houses in question constituted a row of adjoining houses, and that the fire was communicated to four of them from the one first set on fire. As the burning of each house was a distinct felony, the prisoner asked that the prosecutor be put to his election. Erskine, J., said: "As it is all one transaction, we must hear the evidence, and I do not see how, in the present stage of the proceedings, I can call on the prosecutor to elect. I shall take care that, as the case proceeds, the prisoner is not tried for more than one felony. The application for a prosecutor to elect is an application to the discretion of the judge, founded on the supposition that the case extends to more than one charge, and

may, therefore, be likely to embarrass the prisoner in his defence."

While recognizing as fundamental the principle that the court must not permit the defendant to be embarrassed in his defence by a multiplicity of charges embraced in one indictment and to be tried by one jury, and while conceding that regularly or usually an indictment should not include more than one felony, the authorities concur in holding that a joinder in one indictment, in separate counts, of different felonies, at least of the same class or grade, and subject to the same punishment, is not necessarily fatal to the indictment upon demurrer or upon motion to quash or on motion in arrest of judgment, and does not, in every case, by reason alone of such joinder, make it the duty of the court, upon motion of the accused, to compel the prosecutor to elect upon what one of the charges he will go to trial. The court is invested with such discretion as enables it to do justice between the government and the accused. If it be discovered at any time during a trial that the substantial rights of the accused may be prejudiced by a submission to the same jury of more than one distinct charge of felony among two or more of the same class, the court, according to the established principles of criminal law, can compel an election by the prosecutor. That discretion has not been taken away by section 1024 of the Revised Statutes. On the contrary, that section is consistent with the settled rule that the court, in its discretion, may compel an election when it appears from the indictment, or from the evidence, that the prisoner may be embarrassed in his defence, if that course be not pursued.

In the present case, we cannot say from anything on the face of the indictment that the court erred or abused its discretion in overruling the defendant's motion to quash the indictment or his motions, for an election by the government between the two charges of murder. The indictment showed that the two murders were committed on the same day, in the same county and district, and with the same kind of instrument. These facts alone justified the court in forbearing, at the beginning of the trial, and before the facts were disclosed,

to compel an election by the prosecutor between the two charges of murder. When, however, the evidence was concluded — indeed, as soon as the defendant testified in his own behalf — the wisdom of the course pursued by the court became manifest; for it appeared that the two murders were committed at the same place, on the same occasion, and under such circumstances, that the proof in respect to one necessarily threw light upon the other. The accused and the two men alleged to have been murdered were companions in travelling, and were together, in camp, at the place where the killing occurred. The killing of Vandiveer immediately preceded that of Bolding. There was such close connection between the two killings, in respect of time, place, and occasion, that it was difficult, if not impossible, to separate the proof of one charge from the proof of the other. It is, therefore, clear that the accused was not confounded in his defence by the union of the two offences of murder in the same indictment, and that his substantial rights were not prejudiced by the refusal of the court to compel the prosecutor to elect upon which of the two charges he would proceed.

It is appropriate to say that we lay no stress upon the circumstance that the motions in question were not made until after the defendant had pleaded not guilty. We have already said that, if in the progress of the trial it appeared that the accused might be embarrassed or confounded in his defence, by reason of being compelled to meet both charges of murder at the same time, and before the same jury, it was in the power of the court, at any time before the trial was concluded, to require the government to elect upon which charge it would seek a verdict. It is, also, proper to say that we have not regarded as part of the record that which appears in the brief of counsel for the defendant purporting to be an order made in the court below, on the 2d day of October, 1893, amendatory and explanatory of the order of March 23, 1892, relating to the empanelling of the jury that tried this case. The object of this amendatory order was to show more fully, than was done by the order of March 23, 1892, how the trial jury was empanelled. The motion of defendant to strike from the

record a copy of that order was unnecessary, because the government has not moved that it be treated as part of the record, and disclaims any purpose to ask that it shall be considered on this writ of error. Under these circumstances we have not considered whether the alleged order of October 2, 1893, was within the power of the court to make, nor have we based our conclusions upon anything contained in it.

2. The next question to be considered relates to the empanelling of the jury that tried the defendant. It is contended that the action of the court below in that respect was substantially that condemned in *Lewis* v. *United States*, 146 U. S. 370. But this contention cannot be sustained. The decision in that case proceeded upon the ground that it did not appear affirmatively from the record that the prisoner, when required to make his challenges, was brought face to face with the jurors whose names appeared upon the list of thirty-seven qualified jurymen that was furnished, by direction of the court, to the accused and the government. This court said: "It does, indeed, appear that the clerk called the entire panel of the petit jury, but it does not appear that when the jury answered to said call they were present so that they could be inspected by the prisoner; and it is evident that the process of challenging did not begin until after said call had been made. We do not think that the record affirmatively discloses that the prisoner and the jury were brought face to face at the time the challenges were made, but we think that a fair reading of the record leads to the opposite conclusion, and that the prisoner was not brought face to face with the jury until after the challenge had been made, and the selected jurors were brought into the box to be sworn. Thus reading the record, and holding as we do that making of challenges was an essential part of the trial, and that it was one of the substantial rights of the prisoner to be brought face to face with the jurors at the time when the challenges were made, we are brought to the conclusion that the record discloses an error for which the judgment of the court must be reversed."

The record before us discloses a wholly different state of facts. It shows that the jurors were all examined as to their

qualifications, and that thirty-seven were found to be qualified to sit in the case, that is to say, not liable to objection for cause; that the defendant was in court during this examination, was face to face with the jurors so examined, and had an opportunity to participate in the examination to such extent as was necessary to ascertain whether any of them were liable to objection for cause; and that he was at liberty to strike from the list of those thus found to be qualified the names of those, not exceeding twenty, whom he did not wish to serve on the jury. If it did not appear affirmatively from the record of this case that the accused was, in fact, brought face to face with all the jurors who were examined as to their qualifications, and whose names were on the list of thirty-seven furnished to him, or that he was not present during such examination, or that they were not all in his presence when he exercised his right of challenge, the judgment would be reversed for the reasons stated in *Lewis* v. *United States*. We adhere to the decision in that case, as based upon sound principle.

The objection that the jurors were not selected in the particular mode prescribed by the laws of Arkansas, cannot be sustained. By section 800 of the Revised Statutes of the United States, it is provided, substantially, in the words of the act of July 20, 1840, c. 47, 5 Stat. 394, that jurors to serve in the courts of the United States, in the several States, shall have the same qualifications — subject to the provisions contained in other sections, and which have no bearing upon this case — and be entitled to the same exemptions, as jurors of the highest courts of law in the respective States may have, and be entitled to at the time when such jurors for service in the courts of the United States are summoned; and they are required to be "designated by ballot, lot, or otherwise, according to the mode of forming such juries then practised in such state court, so far as such mode may be practicable by the courts of the United States or the officers thereof. And for this purpose the said courts may, by rule or order, conform the designation and empanelling of juries, in substance, to the laws and usages relating to juries in the state courts, from time to time in such State." And by the act of June 30,

1879, c. 52, § 2, 21 Stat. 43, 44, all jurors, grand and petit, in any court of the United States, including those summoned during the session of the court, are required to be publicly drawn from a box containing, at the time of each drawing, the names of not less than three hundred persons, possessing the qualifications prescribed in § 800 of the Revised Statutes, which names shall have been placed in the box by the clerk of court and a commissioner appointed by the judge, who shall be a citizen of good standing, residing in the district in which such court is held, and a well-known member of the principal political party in the district in which the court is held opposing that to which the clerk may belong, the clerk and the commissioner each to place one name in said box alternately, without reference to party affiliations. That act further provides that nothing contained in it shall be construed to prevent any judge from ordering the names of jurors to be drawn from the boxes used by the state authorities in selecting juries in the highest courts of the State, and that "no person shall serve as a petit juror more than one term in any one year, and all juries to serve in courts after the passage of this act shall be drawn in conformity herewith : *Provided,* That no citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States on account of race, color, or previous condition of servitude."

There is nothing in these provisions sustaining the objection made to the mode in which the trial jury was formed. In respect to the qualifications and exemptions of jurors to serve in the courts of the United States, the state laws are controlling. But Congress has not made the laws and usages relating to the designation and empanelling of jurors in the respective state courts applicable to the courts of the United States, except as the latter shall by general standing rule or by special order in a particular case adopt the state practice in that regard. *United States* v. *Shackleford,* 18 How. 588; *United States* v. *Richardson,* 28 Fed. Rep. 61, 69. In the absence of such a rule or order, (and no such rule or order appears to have been made by the court below,) the mode of designating

and empanelling jurors for the trial of cases in the courts of the United States is within the control of those courts, subject only to the restrictions Congress has prescribed, and, also, to such limitations as are recognized by the settled principles of criminal law to be essential in securing impartial juries for the trial of offences.

There is no claim, in the present case, that the jurors for general service in the court below during the term at which the defendant was tried were not selected in accordance with law. The record shows that he was duly served with a full and complete list of the petit jurors selected and drawn by the jury commissioners of the court. Nor is it contended that the jurors who were examined as to their qualifications before the list of thirty-seven qualified jurors was furnished were not properly selected for general service during the term. The complaint by the accused is that the particular mode in which the jury that tried him was empanelled was illegal. It is true that mode was not in conformity with the statutes of Arkansas. But that objection, as already suggested, cannot avail the accused. So that the inquiry must be whether the jury was organized in violation of any settled principle of criminal law relating to the subject of challenges.

The right to challenge a given number of jurors without showing cause is one of the most important of the rights secured to the accused. "The end of challenge," says Coke, "is to have an indifferent trial, and which is required by law; and to bar the party indicted of his lawful challenge is to bar him of a principal matter concerning his trial." 3 Inst. 27, c. 2. He may, if he chooses, peremptorily challenge "on his own dislike, without showing any cause;" he may exercise that right without reason or for no reason, arbitrarily and capriciously. Co. Lit. 156 b; 4 Bl. Com. 353; *Lewis* v. *United States*, 146 U. S. 376. Any system for the empanelling of a jury that presents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned. And, therefore, he cannot be compelled to make a peremptory challenge until he has been brought face to face, in the presence of the court, with each proposed juror, and an opportunity

given for such inspection and examination of him as is required for the due administration of justice.

Were his rights in these respects impaired or their exercise embarrassed by what took place at the trial? We think not. The jurors legally summoned for service on the petit jury were, as we have seen, examined in his presence as to their qualifications, and thirty-seven were ascertained, upon such examination, to be qualified to sit in the case. Both the accused and the government had ample opportunity, as this examination progressed, to have any juror who was disqualified rejected altogether for cause. A list of all those found to be qualified under the law, and not subject to challenge for cause, was furnished to the accused and to the government, each side being required to make their challenges at the same time, and having notice from the court that the first twelve unchallenged would constitute the jury for the trial of the case. It is apparent, from the record, that the persons named in the list so furnished were all brought face to face with the prisoner before he was directed to make, and while he was making, his peremptory challenges.

Was the prisoner entitled, of right, to have the government make its peremptory challenges first, that he might be informed, before making his challenges, what names had been stricken from the list by the prosecutor? In some jurisdictions it is required by statute that the challenge to the juror shall be made by the State before he is passed to the defendant for rejection or acceptance. Such is the law of Arkansas, and the court below was at liberty to pursue that method. Mansfield's Digest, § 2242. And such is regarded by some courts as the better practice, even where no particular mode of challenge is prescribed by statute. *State* v. *Cummings,* 5 La. Ann. 330, 332. But as no such provision is embodied in any act of Congress, it was not bound by any settled rule of criminal law to pursue the particular method required by the local law. The uniform practice in England, as appears from the observations of Mr. Justice Abbott, afterwards Lord Tenterden, in *Brandeth's case,* 32 Howell's St. Tr. 755, was to require the accused to exercise his right of challenge before

calling upon the government. He said : " Having attended,
I believe, more trials of this kind than any other of the judges,
I would state that the uniform practice has been that the
juryman was presented to the prisoner or his counsel, that
they might have a view of his person; then the officer of the
court looked first to the counsel for the prisoner to know
whether they wished to challenge him ; he then turned to the
counsel for the crown to know whether they challenged him."
p. 771.  In the same case, Lord Chief Baron Richards said
that he conceived it to be clear that " it is according to the
practice of the courts that the prisoner should first declare his
resolution as to challenging." p. 774.  Mr. Justice Dallas
expressed his concurrence in those views.  pp. 774, 775.  But
the general rule is, that where the subject is not controlled
by statute, the order in which peremptory challenges shall
be exercised is in the discretion of the court.  *Commonwealth
v. Piper*, 120 Mass. 185 ; *Turpin* v. *State*, 55 Maryland, 464;
*Jones* v. *State*, 2 Blackford, 475; *State* v. *Hays*, 23 Missouri,
287; *State* v. *Pike*, 49 N. H. 406; *State* v. *Shelledy*, 8 Iowa,
477, 480, 504; *State* v. *Boatwright*, 10 Rich. (Law), 407;
*Shufflin* v. *State*, 20 Ohio St. 233.

In some jurisdictions the mode pursued in the challenging
of jurors is for the accused and the government to make their
peremptory challenges as each juror, previously ascertained
to be qualified and not subject to be challenged for cause, is
presented for challenge or acceptance.  But it is not essential
that this mode should be adopted.  In *Regina* v. *Frost*, 9
Car. & P. 129, 137, (1839,) the names of jurors were taken
from the ballot-box, and each was sworn on the *voir dire* as
to his qualifications before being sworn to try.  When the
government peremptorily challenged one who had been sworn
on the *voir dire* as to his qualifications, it was objected that
the challenge came too late, because the juror had taken the
book into his hand to be sworn to try.  In disposing of this
objection Chief Justice Tindal said: " The rule is that
challenges must be made as the jurors come to the book, and
before they are sworn.  The moment the oath is begun it is
too late, and the oath is begun by the juror taking the book,

having been directed by the officer of the court to do so. If the juror takes the book without authority, neither party wishing to challenge is to be prejudiced thereby." These observations, it is apparent, had reference only to the question whether a peremptory challenge could be permitted after the juror had, in fact, taken the book into his hand for the purpose of being sworn to try. At most, in connection with the report of the case, they tend to show that the practice in England, as in some of the States, was to have the question of peremptory challenge as to each juror, sworn on his *voir dire* and found to be free from legal objection, determined as to him before another juror is examined as to his qualifications. But there is no suggestion by any of the judges in Frost's case that that mode was the only one that could be pursued without embarrassing the accused in the exercise of his right of challenge. The authority of the Circuit Courts of the United States to deal with the subject of empanelling juries in criminal cases, by rules of their own, was recognized in *Lewis* v. *United States*, subject to the condition that such rules must be adapted to secure all the rights of the accused. 146 U. S. 379.

We cannot say that the mode pursued in the court below, although different from that prescribed by the laws of Arkansas, was in derogation of the right of peremptory challenge belonging to the accused. He was given, by the statute, the right of peremptorily challenging twenty jurors. That right was accorded to him. Being required to make all of his peremptory challenges at one time, he was entitled to have a full list of jurors upon which appeared the names of such as had been examined under the direction of the court and in his presence, and found to be qualified to sit on the case. Such a list was furnished to him, and he was at liberty to strike from it the whole number allowed by the statute, with knowledge that the first twelve on the list, not challenged by either side, would constitute the jury. And after it was ascertained, in this mode, who would constitute the trial jury, it was within the discretion of the court to permit them to be again examined before being sworn to try. But no such course was sug-

gested, and the record discloses no reason why a further examination was necessary in order to secure an impartial jury. The right of peremptory challenge, this court said, in *United States* v. *Marchant,* 12 Wheat. 480, 482, and in *Hayes* v. *Missouri,* 120 U. S. 68, 71, is not of itself a right to select, but a right to reject, jurors.

It is true that, under the method pursued in this case, it might occur that the defendant would strike from the list the same persons stricken off by the government. But that circumstance does not change the fact that the accused was at liberty to exclude from the jury all, to the number of twenty, who, for any reason, or without reason, were objectionable to him. No injury was done if the government united with him in excluding particular persons from the jury. He was not entitled, of right, to know, in advance, what jurors would be excluded by the government in the exercise of its right of peremptory challenge. He was only entitled, of right, to strike the names of twenty from the list of impartial jurymen furnished him by the court. If upon that list appeared the name of one who was subject to legal objection, the facts in respect to that juror should have been presented in such form that they could be passed upon by this court. But it does not appear that any objection of that character was made, or could have been made, to any of the thirty-seven jurors found, upon examination, to be qualified.

Thus, in our opinion, the essential right of challenge to which the defendant was entitled was fully recognized. And there is no reason to suppose that he was not tried by an impartial jury. The objection that the government should have tendered to him the twelve jurors whom it wished to try the case, or that he was entitled to know before making his challenges the names of the jurors by whom it was proposed to try him, must mean that the government should have been required to exhaust all of its peremptory challenges before he peremptorily challenged any juror. This objection is unsupported by the authorities, and cannot be sustained upon any sound principle.

3. We come now to examine some of the exceptions taken

by the defendant to the charge of the court. Among other observations made by the court to the jury were these: "At this point it becomes necessary for us to ascertain what is meant by these expressions, wilfully and with malice aforethought, because they are the characteristics that enter into the crime of murder; they must exist as a part of that crime; there can be no crime of this kind without them. It is necessary, therefore, for us to understand correctly, and to understand with precision and accuracy, exactly what the law means by them, because they have a legal meaning, they have a meaning that is peculiar to the law, and it is by the application of that meaning to the facts of the case, or the truth of the case, that you, as intelligent, impartial, and dispassionate citizens, are able to arrive at a just and correct and honest conclusion. In finding their existence, it is not necessary that the proof should show that a motive for the act done existed."

The defendant insists that the reverse of this was the law; that proof of malice ought always to show some motive for the homicide. What was in the mind of the court, when the above observations were made, is apparent by the following clauses of the charge that immediately follow those to which exception was taken: "There is always a motive for every human act that is done by an individual who is sane, but sometimes it is undiscoverable; sometimes it cannot be fathomed; sometimes because of its inadequate character, because of its utter insignificant nature compared with a great offence of that kind, honest men, whose minds and hearts have not been corroded by the commission of crime, overlook it, they pass it by. The law does not require impossibilities. The law recognizes that the cause of the killing is sometimes so hidden in the mind and breast of the party who killed, that it cannot be fathomed, and as it does not require impossibilities, it does not require the jury to find it. Yet, if they do find it, it simply becomes an item of evidence in the case, which is only evidentiary at best — that is, it is only an item of evidence going to show whether a particular party may have committed an act, and sometimes going to show the character-

istics of that act; the law says, however, that wherever motive can be found, though it is not required to be found, it is the duty of the jury to find it, though when they do find it they are not to expect that it will ever be adequate; that it will be in proportion to the act done, because there is nothing on this earth that is in proportion to the crime of wilfully and deliberately taking human life; there is no motive adequate to it; there is nothing that can be weighed upon the one side of the scale with the crime of deliberate and wicked murder upon the other side of it, and be pronounced by honest men as equal in weight to the crime committed. The law says that motive need not be proportionate to the heinousness of the crime."

We do not perceive any substantial error of law in what the court said upon the subject of motive. While, as stated, a motive exists for every act done by a person of sound mind, it is not indispensable to conviction that the particular motive for taking the life of a human being shall be established by proof to the satisfaction of the jury. The absence of evidence suggesting a motive for the commission of the crime charged is a circumstance in favor of the accused, to be given such weight as the jury deems proper; but proof of motive is never indispensable to conviction. 1 Bishop's Cr. Pro. § 1107, and authorities there cited. Malice may be presumed from the mere fact of killing, nothing further being shown. *Commonwealth* v. *York*, 9 Met. 93, 114; *Commonwealth* v. *Hawkins*, 3 Gray, 463; 1 Greenl. Ev. § 34. The charge being murder, if the facts constituting that offence were established beyond a reasonable doubt, it was the duty of the jury to have found the defendant guilty as charged, although it may have been impossible to discover any adequate motive for the killing. As said in *Clifton* v. *State*, 73 Alabama, 473: "The presence or absence of a motive for the commission of the offence charged is always a legitimate subject of inquiry, . . . but it is not in any case indispensable to a conviction. It is not an element of the burden of proof the law devolves upon the prosecution whether the agency or connection of the accused is manifested by direct and positive evidence or only by circumstantial evidence, that a motive or inducement to commit

the offence should be proved. The criminal act and the connection of the accused with it being proved beyond a reasonable doubt, the act itself furnishes the evidence that to its perpetration there was some cause or influence moving the mind." So in *McLain* v. *Commonwealth*, 99 Penn. St. 86, 99: "It was further urged that no adequate motive was shown to induce the accused to commit the crime charged. The court well said the Commonwealth was not bound to establish an adequate motive for the alleged crime, and declared, in the words of this court, 'the fact of murder being established, the inability to discover the motive does not disprove the crime.'"

There was evidence before the jury tending to show that the murders in question were committed in order that the defendant might appropriate certain property of inconsiderable value in the possession of the murdered men. Under the circumstances, the inquiry would naturally arise in the minds of jurors whether murder would be committed for reasons so trivial. The court, after observing that all persons were apt to act on inadequate motives, and that the history of crime showed that murders were generally committed from motives comparatively trivial, said: "So also for the smallest plunder murders have been deliberately executed. We have an illustration of this in the trial of Muller, in England, in 1873, for the murder of Briggs. Briggs' watch was seen by Muller in a railway car; Briggs was asleep; the watch was exposed, and Muller killed Briggs by a sudden attack and succeeded in making his escape; he was afterwards arrested, convicted on circumstantial evidence, and before execution confessed the crime with the murder. Until the confession, the justice of the conviction was largely criticised on the ground that the stealing of a watch was not a motive that could explain a murder so bold, so cruel, and the chances of exposure so great." But the court added in the same connection: "But the reply to this is obvious. Crime is rarely logical. Under a government where the laws are executed with ordinary certainty, all crime is a blunder, as well as a wrong. If we should hold that no crime is to be punished except such as is rational, then there would be no crime to be punished, for no crime can be found

that is rational; the motive is never correlative to the crime, never accurately proportioned to it. Nor does this apply solely to the very poor; very rich men have been known to defraud others even of trifles, to forge wills, to kidnap and kill so that an inheritance might be theirs. When a powerful passion seeks gratification it is no extenuation that the act is illogical, for when passion is once allowed to operate, reason loosens its restraints."

Reference was also made to a portion of a charge delivered by a judge in New York upon the subject of motive for the commission of crime, in which it was said that a small sum of money, a word spoken in anger, an insult, wrongs, real or imaginary, revenge, jealousy, hatred, envy, and malice, often lead to the commission of the crime of murder. In that connection, the court below said: "Therefore, in finding the existence of these elements that go to characterize a killing so as to make it murder, you may find their existence, though you do not find any motive."

The defendant excepted to that part of the charge referring to the circumstances of the murder case in England as an exaggerated statement of another case in a manner well calculated to influence the minds of the jurors against the prisoner and to convict without sufficient evidence and hope for a confession from the prisoner to prove the correctness of their verdict. We do not think the exception well founded. Although the practice of alluding to the details of other cases given in the books, while a jury is being charged upon the facts of the particular case on trial, is by no means to be commended, we cannot say that the jury in this case were misled by the reference made to what appeared, or was said by judges, in other cases. It must be assumed, if the contrary does not appear, that jurors understand that these allusions to other cases are made only for purposes of illustration. It is impracticable to prescribe the particular mode in which a judge shall express to jurors his views of the case about to be determined by their verdict. That must, of necessity, be left to his discretion. If in charging a jury a judge chooses to employ the words of others in order to convey the exact

thought in his own mind, or if he prefers, for purposes merely of illustration, to read from the opinions or judgments of other courts, we cannot hold that such practice, although not to be encouraged, is, in the absence of a statute prescribing a different rule, ground for the reversal of the judgment of the trial court. If a judgment should in any case be reversed upon such ground, it should only be where it appears that the jury has been misled by the particular mode in which they were charged to the prejudice of the substantial rights of the accused.

4. It is said that the record fails to show that all things were done in the court below that were necessary to be done before the sentence of death was pronounced, in this: First, the record nowhere states that the verdict was received and recorded; second, there is no record of any judgment declaring plaintiff in error to be guilty of murder.

In respect to the first of these objections it is sufficient to say that it appears from the journal entries of the trial, as well as from the bill of exceptions, that the verdicts of guilty on the first and third counts, respectively, were returned into and were recorded by the court, in the presence of the accused; whereupon the jury were discharged from the further consideration of the case, and the defendant remanded to the custody of the marshal to await the final sentence.

The second of the objections above stated is based upon the following order, under the caption of the United States *v.* John Pointer, Indictment for Murder, No. 37, and made April 30, 1892:

"On motion of William H. H. Clayton, Esq., attorney for the Western District of Arkansas, the said defendant John Pointer was brought to the bar of this court in custody of the marshal of said district, and it being demanded of him what he has to say or can say why the sentence of the law upon the verdict of guilty, heretofore returned against him by the jury in this cause on the 26th day of March, 1892, shall not now be pronounced against him, he says he has nothing further or other to say than he has heretofore said.

"Whereupon the premises being seen, and by the court well

and sufficiently understood, it is considered by the court that the said marshal of the district aforesaid cause the said John Pointer to be taken hence and him, the said John Pointer, safely and securely keep from the date hereof until Tuesday, the 28th day of June, A.D. 1892, and on that day and between the hours of nine o'clock in the forenoon and five o'clock in the afternoon of said day, the said marshal cause the said John Pointer to be taken to some convenient place within this district, to be appointed by said marshal, and then and there, between the said hours of nine o'clock in the forenoon and five o'clock in the afternoon, on Tuesday, the said [28th] day of June, in the year of our Lord one thousand eight hundred and ninety-two, cause the said John Pointer to be hanged by the neck until he is dead.

"And it is further considered by the court that the United States of America do have and recover all their costs in and about this prosecution laid out and expended, and that they have execution therefor.

"And the clerk of this court is hereby required to furnish the marshal of this district with a duly certified copy of this judgment, sentence, and order, which shall be returned by said marshal with a full and true account of the execution of the same."

The specific objection to the sentence is that it does not state the offence of which the defendant was found guilty, or that the defendant was guilty of any named crime. This objection is technical, rather than substantial. The record of the trial preceding the sentence shows an indictment returned into court by grand jurors duly selected, empanelled, sworn, and charged to inquire in and for the body of the Western District of Arkansas, in which, in separate counts, they, upon their oaths, charge the defendant with having within that district on a named day killed and murdered Samuel E. Vandiveer and William D. Bolding. The indictment itself is given, and it appears that the defendant was brought into court upon it; that he was arraigned and pleaded not guilty to the charges contained in it; that he was tried upon the same indictment before a petit jury lawfully empanelled and sworn;

and that a verdict of guilty of murder as charged in the first and third counts, respectively, of that indictment was returned into court March 26, 1892, and was received and incorporated into the record of the trial. When, therefore, the defendant was brought into court and asked what he had to say " why the sentence of the law upon the verdict of guilty, heretofore · returned against him by the jury in this cause, on the 26th day of March, 1892, shall not now be pronounced against him," all doubt as to the offence of which he was found guilty, and on account of which he was sentenced to be hanged, is removed. The sentence itself is in the record, and the record shows everything necessary to justify the punishment inflicted. While the record of a criminal case must state what will affirmatively show the offence, the steps, without which the sentence cannot be good, and the sentence itself, " all parts of the record are to be interpreted together, effect being given to all, if possible, and a deficiency at one place may be supplied by what appears in another." 1 Bishop's Cr. Pro. §§ 1347, 1348. For these reasons the objection last stated is not sustained.

5. Some reference should be made to an order entered on the same day, but after the sentence was passed, in these words: " Ordered by the court, that sentence be suspended on the third count of the indictment, on which the defendant was tried and convicted by the jury for the killing of William · D. Bolding." The record does not state the grounds upon which this order was based. Its object, we suppose, was to restrict the sentence to one of the two charges of murder embraced in the indictment, although the defendant had been tried and found guilty upon both. Be this as it may, that order constitutes no reason in itself for the reversal of the judgment. It did not prejudice the substantial rights of the accused, because it did not prevent this court, upon the present writ of error, from reversing the judgment in its application to all the charges contained in the indictment. This court having reached the conclusion that the judgment must be affirmed, any question as to the propriety or legality of the order suspending the sentence as to the court charging the murder of Bolding, is immaterial. It is necessary, however, in order to

avoid any misapprehension, to say that this court must not be understood as expressing any opinion upon the question suggested by the words of that order, whether a court of the United States, in the absence of authority conferred by statute, has the power, after passing sentence in a criminal case, to suspend its execution indefinitely, and until the court in its discretion removes such suspension. A decision of that question is not necessary to the disposition of this case upon its merits.

There are assignments of error other than those above examined, but they are without merit, and, therefore, need not be noticed in this opinion.

We perceive no error in the record to the prejudice of the substantial rights of the plaintiff in error.

*Judgment affirmed.*