## ARNOLD v. UNITED STATES.

(Circuit Court of Appeals, Seventh Circuit. August 21, 1925. Rehearing Denied September 28, 1925.)

### No. 3463.

**1. Jury ⟨☞99(2)—Overruling of challenge to juror held not abuse of discretion.**

Overruling of challenge of juror, who admitted he had formed impression of case which it might take evidence to remove, *held* not abuse of discretion, in view of his further statement that he had misunderstood question and had formed no opinion of defendant's guilt or innocence.

**2. Jury ⟨☞85—Competency of juror is within discretion of court.**

Competency of juror is primarily matter within discretion of court.

**3. Criminal law ⟨☞1153(4)—Witnesses ⟨☞240(2), 267—Permitting leading questions, and extent of cross-examination, are discretionary.**

Permitting leading questions and extent of cross-examination are matters within discretion of trial court, not reviewable, in absence of showing of abuse of discretion.

**4. Criminal law ⟨☞1036(2)—Objection to manner of examining witnesses must be made at trial.**

Objection to leading questions, or improper cross-examination, must be made at trial, to afford basis for review.

**5. Indictment and information ⟨☞132(5)—Refusal to require government to elect between group of counts of indictment held not error.**

Where indictment, in 31 counts, in three groups, charged use of mails in furtherance of three schemes to defraud, refusal of court to require government to elect on which one of three groups of counts it would proceed *held* not abuse of discretion.

**6. Criminal law ⟨☞1168(1)—Refusal of directed verdict as to particular counts of indictment, if error, held harmless.**

Refusal of court to direct verdict for defendant on certain counts of indictment, including two on which he was convicted, if error, *held* harmless, in view of acquittal as to part of such counts and conviction on numerous other counts.

**7. Criminal law ⟨☞472—Evidence held properly admitted in prosecution for use of mails in furtherance of scheme to defraud.**

In prosecution for use of mails in furtherance of scheme to defraud, where there was evidence that defendant had represented in circulars distributed that bonds sought to be sold would be protected by municipal securities deposited with trustee, it was not error to admit expert testimony defining municipal securities, and as to value of city and county warrants and special assessment bonds.

**8. Criminal law ⟨☞481, 1168(3)—Qualification of expert witness is matter within court's discretion.**

Qualification of expert witness is matter within court's discretion, and not reviewable, except for abuse of discretion.

**9. Criminal law ⟨☞1169(2)—In prosecution for use of mails in furtherance of scheme to defraud, admission in evidence of petition, schedules, and inventory in bankruptcy proceeding of bonding company not reversible error.**

In prosecution for use of mails in furtherance of scheme to defraud, where there was abundant evidence of financial difficulties of bonding company, which defendant controlled and conducted, it was, if technically improper, not reversible error to admit in evidence petition, schedules, and inventory in involuntary bankruptcy proceedings of such company.

**10. Criminal law ⬤➾434—Books kept by company controlled by defendant held properly admitted in prosecution for use of mails in furtherance of scheme to defraud.**

Books of bonding company, given out as correct and apparently approved, though not actually prepared, by defendant, its managing and directing officer, *held* properly admitted against him in prosecution for use of mails in furtherance of scheme to defraud.

**11. Criminal. law ⬤➾369(2)—That. evidence otherwise competent may tend to show. other offenses does not make it incompetent.**

That evidence otherwise competent may tend to show offenses other than that charged does not make it. incompetent.

**12. Post office ⬤➾49—Evidence as to valuation placed on good will of company controlled by defendant held admissible in prosecution for use of mails in furtherance of scheme to defraud.**

In prosecution for use of mails in furtherance of scheme to defraud, evidence that bonding company, managed and controlled by defendant in making financial statement to bank, valued good will at $100,000, whereas, in other statements, such item was valued at $350,000, *held* admissible on question of financial standing and of good faith of representations made concerning it.

**13. Post office ⬤➾49—Evidence held sufficient to establish scheme. to defraud in prosecution for use of mails in furtherance thereof.**

Evidence *held* sufficient to establish scheme to defraud in prosecution for use of mails in furtherance thereof.

In Error to the District Court of the United States for the Western District of Wisconsin.

Victor H. Arnold was convicted of using mails in furtherance of scheme to defraud, and he brings error. Affirmed.

Plaintiff in error, Arnold, prosecutes the writ from a judgment sentencing him upon a conviction under an indictment of originally 31 counts, charging him with using the mails in furtherance of a scheme to defraud. Count 1 sets forth the fraudulent scheme, in brief charging that Arnold was president and wholly dominated the affairs of the Madison Bond Company, a Wisconsin corporation engaged in buying and selling bonds and other securities, which issued for sale various series of its so-called collateral gold bonds, those in question being Nos. 48 to 54, inclusive; that in order to market the various series, and deceive the public into buying them, he caused to be printed and distributed descriptive circulars, wherein it was falsely represented that the payment of the series was secured by deposit with certain named trustees of municipal securities equal to par value of the bonds; that such collateral could not be changed, and would be held as security for the bondholders of the several series until such bonds and interest were paid, and that the legality of the several series had been approved by certain attorneys at law; that the representations were false, in that the collateral was of different character from that represented, and of far less value; that Arnold retained control over the collateral, and changed it or caused it to be changed from time to time at will, greatly reducing its value; that the attorneys represented to have approved the legality of the bonds did not in fact approve them; that as part of the scheme the alleged trustees named in the circulars and in the bonds were not in fact independently acting trustees, but were individuals who were in Arnold's private employ, inexperienced in such matters, and subject to Arnold's control and dictation, and selected so that Arnold might retain full control over such collateral. The scheme as set out in count 1 of the indictment alleges also the use of the mails in furtherance of the scheme. The counts following, up to and including No. 22, charge by reference the same scheme, each setting out a different use of the mails in its furtherance. Count 23 sets up a scheme to defraud stockholders of the Madison Bond Company out of their right to vote certain stock of the company, and this count and those up to and including No. 26 charge the use of the mails in furtherance of that scheme. Count 27 charges the scheme to be the defrauding of the holders of the collateral gold bonds through inducing them to accept alleged worthless notes of Arnold in exchange for them, and this and the remaining counts charge the use of the mails in furtherance of. such scheme. Before the trial count 31 was quashed, and during the trial counts 5, 16, 24, and 28 were nolle prossed. The jury found Arnold guilty upon counts 6, 7, 8, 9, 10, 12, 13, 14, 19, 20, and 21, and not guilty on the other remaining counts, and he was sentenced to five years' imprisonment and to pay $1,000 fine and costs.

Joseph B. Lawler, of Chicago, Ill., for plaintiff in error.

W. H. Dougherty, of Janesville, Wis., for the United States.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). We will address

ourselves to considering seriatim the specific errors alleged and elaborated in the brief and argument for plaintiff in error.

[1] 1. "It was reversible error for the District Court to overrule the defendant's challenge of the juror Truman Bjorn for cause." This juror at one stage of his examination said that from newspaper articles he had formed an impression of the case which it might take evidence to remove. But on examination by the court he stated that, while the newspaper articles naturally created an impression on his mind, and that one looking at the newspaper articles naturally formed some kind of opinion, he had no opinion as to how the case should be decided; that he misunderstood the purport of the question he had previously answered; that he has no opinion upon the guilt or innocence of the accused which it would require evidence to remove; and that, if accepted, he would and could decide the case wholly upon the evidence under the court's instructions.

[2] The competency of jurors is primarily a matter within the discretion of the court. Tex. & Pac. R. Co. v. Hill, 237 U. S. 208, 35 S. Ct. 575, 59 L. Ed. 918; Allen et al. v. U. S. (C. C. A.) 4 F.(2d) 688; Remus v. United States (C. C. A.) 291 F. 501. Nothing is disclosed which indicates that by this ruling the court's discretion was transgressed. Besides, it does not appear that plaintiff in error then or afterwards exercised any of his peremptory challenges, and he is not in position to complain of the acceptance of this juror, when he had it in his power to have him dismissed without cause. Stroud v. United States, 251 U. S. 15, 40 S. Ct. 50, 64 L. Ed. 103; Spies v. Illinois, 123 U. S. 131, 8 S. Ct. 21, 31 L. Ed. 80; Hopt v. Utah, 120 U. S. 430, 7 S. Ct. 614, 30 L. Ed. 708.

[3, 4] 2. Error in conduct of the trial is charged in (a) permitting the district attorney to ask leading and suggestive questions; (b) in permitting improper cross-examination of the defendant. These are incidents of a trial within the sound discretion of the trial court, and unless abuse of discretion is apparent the reviewing court will not for any such cause disturb a judgment. Northern Pac. R. Co. v. Urlin, 158 U. S. 271, 15 S. Ct. 840, 39 L. Ed. 977; Linn v. United States, 251 F. 476, 163 C. C. A. 470; 1 Wigmore on Evidence, § 770. In most of the instances complained of, no objection was made, or, if made, it was not specifically pointed out that the form of the question was objectionable, or that questions now complained of were not proper as cross-examination, as must be done in order to afford basis of complaint. Noonan v. Mining Co., 121 U. S. 393, 7 S. Ct. 911, 30 L. Ed. 1061.

[5] 3. That on defendant's motion the court should have required the government to elect upon which one of the three groups of counts it would proceed. The statute provides: "When there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together, or for two or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments, the whole may be joined in one indictment in separate counts." Rev. Stat. § 1024 (Comp. St. § 1690).

In Pointer v. United States, 151 U. S. 396, 14 S. Ct. 410, 38 L. Ed. 208, it was held that, notwithstanding the statute, "the court is invested with such discretion as enables it to do justice between the government and the accused. If it be discovered at any time during a trial that the substantial rights of the accused may be prejudiced by a submission to the same jury of more than one distinct charge of felony among two or more of the same class, the court, according to the established principles of criminal law, can compel an election by the prosecutor." In that case the court denied a motion to compel election by the prosecutor as between counts charging different murders committed on the same day.

The comment in that opinion upon that situation is quite applicable here. It states: "When, however, the evidence was concluded—indeed, as soon as the defendant testified in his own behalf—the wisdom of the course pursued by the court became manifest; for it appeared that the two murders were committed at the same place, on the same occasion, and under such circumstances that the proof in respect to one necessarily threw light upon the other."

The three schemes charged in the indictment involved the relations of the sole defendant with the affairs of the Madison Bond Company. Much latitude of evidence is permitted in the making of proof of these relations. Much, if not all, of the evidence admissible upon the second and third schemes charged would have been admissible under the first. And indeed it is quite likely that what was admitted under the first scheme would in large measure, if not wholly, have

been admissible under the other two. In the reply brief for plaintiff in error it is stated upon this proposition that "only the discretion of the trial judge will be reviewed," and we are of opinion that no abuse of discretion was shown. It is interesting to note that Pointer was convicted of both charges for murder, whereas here there was acquittal on the counts involved in the two last schemes, and conviction only on some of those of the first.

[6] 4. This contention of error is that the court should have instructed the jury to find the defendant not guilty on counts 23 to 26, inclusive, involving the second scheme, and 27 to 30, inclusive, the third scheme. In view of acquittal under all of these counts, we can see no possible harm to plaintiff in the court's denial of the motion to so instruct. Had such instruction been given, the jury could have done no more than find for the defendant on these counts, and this it did without direction.

[7] 5. This contention, as stated in plaintiff in error's brief, is: "The court should not have admitted expert testimony as to (a) definition of a municipal security; (b) as to the value of city and county warrants and special assessment bonds by so-called experts." Under (a) the brief states: "The only question to be considered by this court is whether the trial judge abused his discretion in allowing experts to testify what in their opinion a municipal security was and is." Six or more witnesses testified in substance that it was well known and understood in the investment business in Wisconsin that the term "municipal securities" did not include such obligations as were a charge upon only a part of the municipality, such as special assessment bonds or warrants collectible only from the parts of a municipality benefited by and assessed for the improvement, and some of the witnesses testified that the term did not include obligations which are past due and defaulted.

The significance of the contention is found in the fact that the circulars put forth in marketing each of the series, except 51 and 54, contained the statement that "the Madison Bond Company has deposited with the trustee municipal securities." Under some of the series practically all of the securities that were deposited were past due, some of them were special assessment warrants or bonds, and many were past-due interest coupons. We think it was fairly a question of fact for the jury whether or not by the circulars it was intended that the investing public should be led to believe that the se-

curity back of the investment would be undefaulted general obligations of the entire municipality. Some of the witnesses testified that such was as well the meaning of the term in neighboring states, but in the main the testimony on that subject related to Wisconsin alone, in which state only the campaigns for the sale of the collateral gold bonds were conducted.

[8] Neither do we find any ground for serious complaint as to the qualification of witnesses who testified thereon, and upon the value of certain of the securities. The qualification of witnesses to give opinion or expert evidence is in the court's discretion, not reviewable except for abuse. 1 Wigmore on Evidence, § 561.

6. This contention lies in the court's failure to direct the jury to find the defendant not guilty on counts 17, 18, 19, 20, and 21, because of the asserted failure to offer in evidence the mail matter set forth in these counts, and because no foundation was laid for introduction of the secondary evidence which was received. The contention at this stage of the case is of no practical consequence. The defendant was acquitted upon counts 17 and 18, and, apart from counts 19, 20, and 21, was convicted on eight other counts of the first group, any one of which would support the verdict and judgment.

[9] 7. This proposition urges as error the admission in evidence for the government of the petitions, schedules, and inventory in bankruptcy of the Madison Bond Company. Generally speaking, it was competent to show in evidence the course of business of the company subsequent to the time of the alleged fraudulent scheme as bearing on the defendant's intent. It appeared in the evidence that some time prior to the filing of the involuntary petition in bankruptcy a protective committee for the bondholders had been appointed. From this and much other evidence admitted it was apparent that the bond company was in financial straits, and the fact of its bankruptcy otherwise abundantly appeared in evidence. The company was the primary debtor upon all the bonds it had issued, and from the evidence it was manifest that the collateral back of these bonds would in most cases, if not all, fall far short of discharging the debt. Even though the evidence was not technically proper, no conceivable harm accrued to the defendant through its admission.

[10] 8. This proposition deals with the alleged error in admission in evidence for the government of the books of the Madi-

son Bond Company, for the stated reason that the defendant himself did not keep the books. But there was much evidence to the effect that the bond company was essentially a "one-man corporation," and that Arnold was that man. Although there was more or less shifting of the stock, he was always in control of the company's affairs, and of its employees. Though living in Chicago much of the time between the fall of 1919 and March, 1921, reports of its transactions were daily made to him, and securities were subject to his approval. From March, 1921, he was at Madison most of the time and in constant and intimate association with the bond company's affairs. He was at all times not merely in name its president, but its managing and directing officer as well. In May, 1921, he caused to be made a complete audit of the books, which he gave out as correct and apparently approved. Persons, who were at various times bookkeepers, testified to their correctness, and the objection to their admission is not upon the grounds that their correctness was not shown, but generally because incompetent against the defendant. Under the circumstances indicated, we think the case falls fairly within the rule which this court applied in Freeman v. United States, 244 F. 1, 156 C. C. A. 429, where books kept under defendant's general direction by his employees, and stated to have been correctly kept, were held to be admissible in evidence for the government, although the defendant had no actual participation in their keeping.

[11, 12] 9. The ninth asserted error is in the admission of evidence tending to show offenses other than those specifically charged in the indictment. Two items are discussed in the briefs. One is the admission of a financial statement to the Continental & Commercial Bank of Chicago as of December 31, 1918, signed by the bond company, by Arnold, president. The other is in respect to the testimony of Mrs. McCambridge, office assistant and for a time secretary of the bond company, to the effect that occasionally at Arnold's direction in gathering up collateral for prospective bond issues of the company, securities left by clients for safekeeping would be taken.

The fact that such acts might show separate offenses would not of itself make the evidence incompetent. Lefkowitz et al. v. United States (C. C. A.) 273 F. 664; Tucker v. United States, 224 F. 833, 140 C. C. A. 279. While it was not directly charged that part of the fraudulent scheme was the tak-

ing of securities belonging to others and placing them as collateral behind the bond company's obligations, yet such evidence affords light, not only upon the company's financial standing, which was in issue, but as well upon the intent to initiate the improper practices particularly alleged, such as the shifting and depletion of securities pledged with trustees as collateral to specific bond issues of the company.

The statement to the Chicago bank is in itself of little consequence, except as to an item in it of good will of $100,000, which item, on the company's books and in statements before and after this one, was carried at $350,000. The responsibility of the Madison Bond Company was specifically pledged or referred to in most or all of the circulars in question, and it was proper to show the acts of the defendant that had any bearing on its financial standing, and the good faith of representations made about it. In this view it was not improper to show that, while it was generally held out that its good will was worth $350,000, yet, when it came to make a statement to a bank with which it would do business, the good will item was far more conservatively represented. Indeed, it is not apparent wherein this item might constitute a separate offense, unless even the far more modest representation to the bank of the good will value might still be regarded as grossly excessive and fraudulent as against the bank—a contention which plaintiff in error will hardly put forth.

[13] 10. This proposition is that "there was no scheme of any kind to defraud." Its consideration has involved examination of the entire record. That under the evidence Arnold is chargeable with responsibility for the circulars is now hardly open to dispute. There was abundance of evidence from which the jury, if they believed it, was justified in so finding. It appears that at all times, whether while he held practically all the Madison Bond Company's stock, or had divested himself of title to most of it, he completely dominated its affairs. He was its president, and had controlling voice in substantially all its business transactions. Its purchases were practically all either conducted or supervised by him. During the last few years of its existence, its purchases were largely made through Victor H. Arnold & Co., a so-called partnership, or its successor, the Victor H. Arnold Company, a corporation of which Arnold was practically the only stockholder. This concern operated in Chicago. He completely dominated its affairs, and practically its

sole business was buying securities, and selling them to the Madison Bond Company at prices that Arnold would fix. Indeed, in May, 1920, Arnold had the Madison Bond Company's board of directors authorize a contract whereby the Madison Bond Company agreed for five years to purchase all of its bonds from the Victor H. Arnold Company, without specifying any means of fixing prices. Witnesses testified that he was kept fully posted of practically every business transaction of the Madison Company, receiving daily written reports, and being in constant communication with it by mail, telephone, and telegraph. It was testified that all of the collateral bond issues in question were made with his knowledge and consent and general direction, and that the circulars were either handed or sent to him, and the jury was warranted in concluding that he fully understood and sanctioned all they contained.

It is significant that in all of the Madison Company's bond issues prior to series 48 the trustees of the deposited collateral were large corporations of good standing in the financial world, but that, beginning with series 48 (issued August 15, 1920), Arnold inaugurated a different policy in this regard, and caused the trustees to be individuals, and these individuals his own employees—in two issues, his secretary; in another, a brother-in-law. It was testified that it was more or less difficult to obtain exchanges of securities from corporate trustees; that they did not freely permit substitution, and in some instances insisted that, when collateral was paid, the proceeds should be deposited with them for the sole benefit of the obligations they secured. It seems that a more accessible and complaisant trustee was desirable. The trustee of three of the issues testified that he had no knowledge of the duties of a trustee, and he practically abdicated his functions in that regard to Arnold's private secretary and, when he ultimately resigned as trustee, Arnold, without any authority under the trust agreement, constituted her, the secretary, as trustee, and then she had the custody of the securities, although her custody was previously not less, since she, as well as the named trustee, had a key to the safety box wherein they were placed. While the collateral gold bonds provided for payment of interest and principal at the office of the trustee, the trustees in fact had no office, only that, as employees of Arnold or his company, their duties were in his office. Controlling the trustees, he controlled the collateral; indeed, at times he had the keys to the deposit boxes wherein they were kept. In this manner the maker of the collateral gold bonds in effect remained in possession of the collateral it put up to secure them. With an independent, responsible trustee, corporate or personal, this could not likely have been done.

It seems that there was a considerable accumulation of defaulted interest coupons or warrants upon collateral which had been put up under previous series, which interest, as it matured, the Madison Bond Company had paid to its customers, as is the practice with many investment concerns which desire thus to keep in the good graces of their clients. Such payment was generally made by taking over the matured coupons, or warrants, or whatever they might be, and issuing to a customer new collateral bonds. An officer of the Madison Company testified that these could not be sold for investment, nor used by the company as collateral for loans to it in the usual way, and that Arnold had said no corporate trustee would carry them as collateral to a bond issue.

The circumstances indicate that it was intended that the deposited securities should from time to time be withdrawn from the trustee, as and when it might suit Arnold's plans. Yet the circulars stated that the deposited collateral could not and would not be withdrawn from possession of the trustees until the obligations they secured had been paid. If, as the jury might have concluded, this representation was put forth with the intent that thereby prospective bond purchasers might be induced to make investments which otherwise they would not make, the fraudulent intent and scheme appears.

Then there is the representation in the circulars that certain named lawyers had passed upon the legality. The nearest this came to being true was that in one or two of the instances the attorney named had prepared the trust agreement. But this would not comply with the representation, "legality approved by" the named attorney. In other instances it was testified that the trust deeds were prepared by some one in the bond company's office, by changing over some former trust agreement which an attorney had prepared for previous collateral bond issues. The attorneys represented in the circulars did not in any of the series in question pass upon the legality of the transaction, and whether such a representation was made with fraudulent intent, and was part of a

scheme to defraud intending investors, was for the jury.,

After the deposit of the security, much of it was withdrawn, and the proceeds of such of it as was paid went to the Madison Bond Company, and not to the trustees, for protection of the collaterally secured bondholders. It is true that later, when the clouds had gathered and serious trouble for the Madison Company was impending such collateral as could then be obtained was placed behind various of the series, some to the amount originally deposited, but in a number of them very considerably short. This, however, would not neutralize the consequences of an originally fraudulent scheme if such appears. Indeed, some of such collateral deposits, made within four months of the bankruptcy, were held to be in fraud of general creditors of the bond company, and ordered returned to the trustee in bankruptcy.

It is also significant that, as to series 54, to secure which the circular represented there had been deposited with the trustee tax securities and first mortgages on business property in the city of Madison, Wis., up to about the time of bankruptcy proceedings against the company (when there was outstanding $68,500 of the bonds of this series), no mortgage whatever had been deposited, and then there was deposited a mortgage on property valued at not over $3,000 or $4,000, the purpose of which at that late day Arnold admitted on cross-examination was "to comply with the circular and the trust deed." It is also noteworthy that some of the theretofore withdrawn securities were replaced by notes in large amount of the Victor H. Arnold Company, guaranteed by Arnold, of probably then little or no value.

It was urged that Mr. Arnold turned over a great deal of property of his own in order to help meet the obligations of the bond company. Whether this was in pursuance of an originally innocent purpose, or out of a motive not so laudable, was within the jury's province, and with its conclusion thereon, as well as upon other propositions purely of fact, we are not at liberty to interfere.

We do not attempt to state in detail the voluminous evidence. Our reference to what may be termed "high spots" in the record is only for the purpose of briefly indicating some of the reasons wherefor we cannot agree with the contention that there was no evidence of a fraudulent scheme.

There is no complaint respecting the charge of the court, and nothing appears wherefor we would feel justified in disturbing the judgment, which is accordingly affirmed.